IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ONE MEDIA IP LIMITED ) | |
| As successor-in-interest to ) | |
| TELOS HOLDINGS, INC. ) | |
| d/b/a POINT CLASSICS ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 3-14:0957 |
| ) | JURY DEMAND |
| S.A.A.R. SrL, ) | |
| BELIEVE SAS d/b/a BELIEVE DIGITAL GROUP ) | |
| And BELIEVE US, ) | |
| HENRY HADAWAY ORGANISATION, LTD. ) | |
| HHO LICENSING LIMITED, ) | |
| HENRY HADAWAY, and ) | |
| DOES 1-10, inclusive ) | |
| ) | |
|     Defendants. ) | |

**PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANTS
BELIEVE'S AND SAAR'S MOTION TO DISMISS AND
PLAINTIFF'S CROSS MOTION IN THE ALTERNATIVE TO TRANSFER VENUE**

Plaintiff One Media IP Limited as successor-in-interest to Telos Holdings, Inc. d/b/a Point Classics ("Plaintiff") files this supplemental response to Defendants Believe's and SAAR's respective Motions to Dismiss following jurisdictional discovery. Plaintiff hereby files simultaneously, in the alternative, a Cross-Motion to Transfer Venue to the United States District Court, Eastern District of New York.[1] Plaintiff incorporates all of the arguments it set out in its original responses and replies to Believe's and SAAR's Motions to Dismiss (*See* Doc. Nos. 22, 30, 45 and 61) and submits its supplemental arguments set forth below pursuant to the Court's Order.

---

[1] Plaintiff incorporates its legal arguments in support of its Cross-Motion herein.

1

Following jurisdictional discovery and based on various documents and information produced by Defendants, Plaintiff submits that there is more than enough activity in and connection to Tennessee for this Court to reasonably exercise jurisdiction over both Defendants.

### History of Ownership from 2000 to the Present

Per the Court's request in its January 23, 2015 Memorandum and Order (Doc. No. 65), following is a clearer history of the Point Classics Catalog (the "Catalog") ownership from late 2000 to the present. Point Classics, LLC, a Tennessee limited liability company ("LLC"), acquired the Catalog in November 2000 from one of its sister corporations, One Music Corporation. **Copyright Assignment,** Exhibit A. The LLC maintained ownership and policed its exclusive rights through many lawsuits between 2000 and 2009.[2] Each and every case upheld and recognized the LLC's exclusive ownership rights in and to the Catalog. The Members of the LLC included Jim and Deborah Long who became the sole Members circa 2000 at the time the LLC acquired the Catalog. **Plt. Resp. to Interrog. #13 at ¶8**, Exhibit B. During this same time period, the LLC went to great lengths to secure Certificates of Registration from the Library of Congress covering approximately 4,500 sound recordings included in the Catalog. *See* **Certificates of Registration**, Exhibit C. On December 31, 2007, the LLC entered into an assignment with Telos Holdings, Inc., a Texas corporation, also owned exclusively by the Longs. *See* Exhibit A. No assignment of copyright regarding the 2007 transaction for the catalog was recorded with the Library of Congress. The LLC was administratively terminated by the Tennessee Secretary of State nearly two years later in July 2009. *See* **TN Sec. of State Business**

---

[2] *See* Platinum Entertainment, Inc. v. Point Classics, LLC, M.D. Tenn., Case No. 3:01-1413 (2001); Point Classics, LLC v. BCI Eclipse LLC, Davidson County Chancery Court, Case No. 02-1189-II (2003); Point Classics, LLC v. MP3.com *et al*, M.D. Tenn., Case No. 3:03-1154 (2003); Point Classics, LLC v. Klaus Kraemer, D.C. Hamburg, Germany, Case No. 308 O 113/01 (2004); Point Classics, LLC v. Sheridan Square Entertainment; M.D. Tenn., Case No. 3:07-0065 (2007); Telos Holdings, Inc., v. X5 Music Group AB, M.D. Tenn., Case No. 3:08-0079 (2008); Telos Holdings, Inc. d/b/a Point Classics v. Cascade GmbH, M.D. Tenn., Case No. 3:09-0380 (2009); Telos Holdings, Inc. d/b/a Point Classics v. SLG, LLC, M.D. Tenn., Case No. 3:09-1045 (2009).

**Information Search,** Exhibit D, https://tnbear.tn.gov/ECommerce/. From 2008 through 2014, the Longs continued doing business as "Point Classics" as licensees continued remitting payments from exploitations of the Catalog to "Point Classics" and the LLC. The Point Classics trademark remained registered with the LLC until 2014. **USPTO Notice of Recordation of Assignment**, Exhibit E. In essence, following the administrative termination of the LLC, the Longs continued operating as a Tennessee general partnership in accordance with the Tennessee Revised Uniform Partnership Act. *See* T.C.A. § 61-1-101 *et al.* On July 1, 2014, One Media IP Limited ("One Media") acquired all right, title and interest in and to the Catalog as well as all other assets relating to Point Classics (e.g., the trademark, domain name/URL, accounts receivable, ASCAP publishing designee, etc.) from Telos Holdings, Inc., the LLC and Point Classics General Partnership. **Catalog Acquisition Agreement**, Exhibit F. Despite the July 2009 administrative termination, the LLC continued its winding down activities through October 2014 following One Media's acquisition of the Catalog and its associated assets.[3] The assignment of copyrights regarding the catalog was recorded with the Library of Congress on October 3, 2014. **Assignment of Copyrights**, Exhibit G.

    A plaintiff has the right to file its complaint where the defendant may be found or where the cause of action/injury arose. 28 U.S.C. § 1391(b). As described more fully below, the original injury occurred when SAAR began unlawfully exploiting the Catalog pursuant to its 2000 license agreement with HHO Limited. The LLC owned the Catalog as of November 2000. Furthermore, the injury continued when SAAR entered into its digital distribution agreement with Believe's predecessor, MTunes, on October 2007. The LLC remained the active owner of

---

[3] Some of Point Classics' winding down activities included continued litigation to enforce its exclusive rights in the Catalog, assignment of assets to Telos Holdings, Inc. and One Media, and the recording of various copyright and trademark documents with the Library of Congress and USPTO. *See* Exhibit B at #15, ¶ 9. The LLC and Point Classics GP also continued receiving royalties during this time period from third party licensees, all of which were assigned to One Media effective July 1, 2014, in accordance with the acquisition agreement.

the Catalog at that time as well. Despite Defendants' attempt to side-step the clear fact that the infringing activity originally involved a Tennessee company, Defendants cannot overcome this hurdle in avoiding jurisdiction of this Court as the LLC was the original injured party resulting from Defendants' actions.[4]

### I. **It is Proper and Reasonable for this Court to Exercise Personal Jurisdiction over Defendants.**

#### A. **Defendants have purposefully availed themselves of the privilege of acting in Tennessee, and as a result, have caused a consequence in Tennessee.**

Defendant Believe does not dispute that it placed the Catalog into commerce, including within the State of Tennessee, pursuant to its agreement with Defendant SAAR, dating back to 2007 (via its predecessor, MTunes Digital Distribution, GmbH). **MTunes/SAAR Distribution Agreement**, Exhibit H. The recordings in question were owned by a Tennessee LLC when both Defendants began their infringing activities (i.e., SAAR in 2000[5] and Believe/MTunes in 2007). See Exhibit A.

Both Defendants have asserted that jurisdiction should not be exercised because neither has any connection to Tennessee. The crux of both Defendants' arguments is that this Court should not exercise jurisdiction simply because neither Defendant entered into contracts in Tennessee, hired employees in Tennessee, or held offices in Tennessee. However, the courts, including the Sixth Circuit, have repeatedly held that these "physical presence" items are not necessary in exercising jurisdiction over foreign defendants, especially in the age of digital

---

[4] This Court has previously held that a party is allowed to recover copyright infringement damages occurring outside of the typical three-year statute of limitations so long as the copyright holder "did not discover and reasonably could not have discovered the infringement" before commencing suit. See Castronuovo v. Sony Music Entm't, 2013 U.S. Dist. LEXIS 123785 at *13-14 (M.D. Tenn., Aug. 29, 2013) (ruling that plaintiff could reach back 17 years for infringement damages). Here, Plaintiff filed the original Complaint (Doc. No. 1) on April 8, 2014, around eight months after first discovering Defendants' infringing activities. See Complaint at ¶ 3.

[5] Another entity (One Music Corporation) owned by the same individuals who now own the LLC/general partnership purchased the catalog from Point Classics, UK in June 2000 before transferring it to the LLC in November 2000.

distribution of products, including music. *See* Mohasco, 401 F.2d at 382; Armstrong v. Virgin Records Ltd, 91 F.Supp.2d 628, 638 (S.D.N.Y. 2000), *citing to* Mattel, Inc. v. MCA Records, Inc., 28 F.Supp.2d 1120, 1127-28 (C.D. Cal. 1998) (holding that jurisdiction over a foreign defendant that had no offices, employees, property or agents in the forum was proper due to a coordinated plan to distribute around the world). In fact, following *Mohasco* and *Mattel*, jurisdiction over the Defendants, despite their lack of offices, employees, property or agents in Tennessee, is appropriate given their "coordinated plan" to distribute the recordings worldwide, including the United States. Neither Defendant *merely* placed recordings into commerce. Both overtly negotiated a license to have the recordings distributed within the United States, and not only did they negotiate the license and place the recordings into the marketplace, they reaped benefits of unauthorized exploitations within the United States for many years. In fact, the Believe/SAAR distribution agreement explicitly provides that the "Territory of this agreement shall be the World other than such excluded territories as listed in Appendix A." *See* **Believe Digital Distribution Agreement,** Exhibit I. Notably, Appendix A, which is presumably page 11 of the agreement, was not produced by Believe. Nevertheless, it is clear from the language of the agreement that the parties had the ability to carve out whatever territories they desired to exclude, yet they choose to include the United States.[6] Simply not having contracts, employees or offices within Tennessee is not enough to get out from under jurisdiction in this State (or any other state) when business transactions clearly occurred following the parties' coordinated plan to access U.S. music consumers.

       The Sixth Circuit applies the "general fairness" standard in determining this factor. Mohasco, 401 F.2d at 382. Business operations set in motion by defendants that have a realistic

---

[6] Likewise, the MTunes/SAAR agreement explicitly provided, "Label (SAAR) hereby acknowledges and MTunes accepts Label's intention to sell Label's music catalogue…worldwide." *See* Exhibit H at 1.2.

5

impact on the commerce of the state constitutes the transacting of business. *Id.* SAAR identified 1,466 recordings that were unlawfully licensed to Believe. **SAAR "Point Classics" Schedule**, Exhibit J. This represents approximately one-third of the entire Catalog, which contains 4,558 registered recordings. *See* Exhibit G, at OMIP432. As the Sixth Circuit noted in *Mohasco*, a "defendant has purposefully availed [itself] of the opportunity of acting [in the forum state] if [it] should have reasonably foreseen that the transaction would have consequences in that state. Mohasco, 401 F.2d at 382. Here, had either Defendant conducted even the simplest of copyright search, they would have found that the LLC, a Tennessee limited liability company, was the copyright owner of record with the Library of Congress from in or around 2007 all the way through October 2014. *See* Exhibit J at SAAR0044 and **Copyright Public Catalog "Symphony no. 2 Little Russian**," Exhibit K (a random search for one of the SAAR identified tracks and corresponding copyright record search). Such minimal due diligence would have undoubtedly resulted in the Defendants "reasonably foresee[ing]" that the exploitation of the recordings in the United States would have consequences in Tennessee. Additionally, it is no secret across the European Union and throughout the United States that the Catalog was owned by a then-Tennessee company as the Catalog was involved in multiple cases of copyright infringement. *Supra* pg.2 n.2. Furthermore, Defendants continued the unauthorized exploitations over one year after being put on notice by Plaintiff. *See* Doc. No. 22 at ¶¶ 3-4. Even after multiple letters, emails and the initiation of this lawsuit, Defendants continued to exploit the Catalog as recent as March, 2015, despite having been in possession of the full catalog spreadsheet since September 2014. **iTunes Store Samples**, Exhibit L.

Additionally, the "something more" requirement was met when Defendant SAAR knowingly exceeded the terms of its written (invalid) license with HHO Limited, which was

6
Case 3:14-cv-00957   Document 68   Filed 05/13/15   Page 6 of 20 PageID #: 1421

restricted to physical product only and solely within the European Union and Italy. *See* First Amended Complaint at ¶ 2.  SAAR took that extra step by seeking out a distributor who could access the worldwide market (and chose to include the United States when it had the contractual right to exclude it) even though SAAR did not have the right to exploit in those territories under its invalid license.  Per the terms of the Believe distribution agreement, Believe made its "Digital Distribution" facilities and services available to SAAR and SAAR chose which recordings to upload, promote, and distribute by uploading through SAAR's "Personal Area."  *See* Exhibit I, Introduction para.2 and Section 2. Additionally, like the *Bridgeport* court found, the Believe/SAAR agreement requires Believe to distribute to the United States – it is not merely "likely" as the agreement provides that the "Territory" of the distribution "**shall** be the World…." Exhibit I, Section 6 (emphasis added); *See* Bridgeport, 327 F.3d at 480 (finding jurisdiction over a particular defendant where the distribution agreement required distribution of product in all fifty states). Moreover, SAAR operates a website through which users can search SAAR's catalog of music and purchase records by being redirected to iTunes.[7] In fact, on SAAR's homepage, it advertises artists and with one click of the button, users are taken to iTunes where they can immediately purchase the advertised artist's recordings.  **SAAR Records Homepage** (with corresponding iTunes store link from homepage) Exhibit M.  SAAR's website also allows users to search its online catalog and request licenses directly from SAAR. A search of the SAAR online catalog resulted in finding multiple Point Classics recordings. **SAAR Records Licensing**

---

[7] The District Court for the Western District of Michigan very recently issued a ruling with strikingly similar facts in Mor-Dall Enters. v. Dark Horse Distillery, LLC, 16 F.Supp.3d 874 (W.D. Mich. 2014).  There, the defendant's website contained a direct link to its products available for purchase on third party websites. *Id.* at 878.  In citing to Bridgeport, where the Sixth Circuit held that a defendant who placed its product into the national stream of commerce via a national distribution agreement **and** operated a website providing a link to products that could be ordered via Amazon, the minimum contacts necessary under the *Due Process clause* were met. *Id.* at 879-880, *citing to* Bridgeport, 327 F.3d at 484.  The Mor-Dall court noted that "to allow a defendant to escape personal jurisdiction in a particular forum simply because its interactive website redirects customers to a third-party vendor's site to complete a sale would undermine the traditional notions of fair play and substantial justice that protect both plaintiffs and defendants." *Id*. at 880.

7

**Portal**, Exhibit N. Mysteriously (or perhaps conveniently), the SAAR classical catalog is no longer available on SAAR's website and SAAR refused to respond to supplemental discovery requests specifically seeking information on the SAAR WebFile Portal.[8] Exercising jurisdiction over SAAR based on these facts would follow the finding of this Court in Bridgeport Music, Inc. v. Still N the Water Publ'g, 327 F.3d 472 (6th Cir. 2003) where this Court exercised jurisdiction over a foreign defendant who operated a website through which users could access the defendant's catalog of music and purchase records, even though the customers were redirected to Amazon.com for the purchases. *Id.* at 483-84. That same *Bridgeport* defendant entered into a nationwide distribution agreement that included the United States. *Id.* Here, SAAR fits the *Bridgeport* case square for square. Utilizing the *Bridgeport* analysis, jurisdiction should be extended over SAAR on this basis.

Sales in the US and Tennessee is another reason why the Court should exercise jurisdiction over the Defendants. Plaintiff issued takedown requests to iTunes in 2013 covering 153 recordings initially identified by Plaintiff (i.e., a mere 10% of the total number of recordings SAAR unlawfully licensed to Believe). SAAR reported receipts allegedly covering all 1,466 unlicensed recordings[9] totaling approximately €27,000 for the three year period between 1Q 2011 and 1Q 2014, of which approximately €7,000 is attributable to April 2013 through March 2014 (i.e., the one year period pursuant to the Believe/SAAR distribution agreement). Yet the

---

[8] Other courts have also exercised personal jurisdiction over foreign defendants in similar cases. For example, in Inset Sys. v. Instruction Set, 937 F.Supp. 161 (D.Conn. 1996), the district court held that the minimum contacts standard was met when an out of state company's website was accessible to Connecticut residents and invited them to call an 800 number to place orders. *Id.* at 165. There, the court did not inquire whether any transactions had taken place or even if any residents with Internet access had logged onto defendant's site. *Id.* The **potential** for access to and transactions from the forum was sufficient for the court. Likewise, an Arizona court noted that a commercial website operator "should not be permitted to take advantage of modern technology through an Internet Web page and forum and simultaneously escape traditional notions of jurisdiction. See EDIAS Software Int'l v. Basis Int'l, 947 F.Supp. 413, 420 (D.Ariz. 1996).

[9] However, this sales report was expressly for digital sales and does not include any reporting of physical sales based on the physical-product license that SAAR relied upon dated March 2000.

Declaration of Believe's Anne Hindermeyer asserts that Believe received revenues of only "505 euros (379 euros paid through to SAAR)" for the same one-year period during which SAAR reported receipts of 7,000 euros. *See* Doc. No. 38-2, ¶ 19.[10] Clearly there are massive discrepancies amongst the purported accountings.

Nonetheless, Plaintiff submits that (i) the Defendants' entering into a worldwide distribution agreement, which included the United States, without conducting even an iota of due diligence on who owned the copyrights, (ii) the subsequent sales in Tennessee, and (iii) the fact that a Tennessee company originally owned the recordings when the first infringement occurred in 2007 (or 2000 with respect to SAAR), all amount to satisfying the first *Mohasco* element as well as the "general fairness" standard afforded to defendants. Whether it is one hundred downloads or one, the fact remains that the tortious act of copyright infringement was committed in Tennessee when one download occurred. *See* Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259 (9th Cir. 1996); Gershwin Publ. Copr. V. Columbia Artists Mgm't, Inc., 443 F.2d 1159 (2d. Cir. 1971); Polygram Int'l Publ. v. Nevada/TIG, Inc., 855 F.Supp. 1314 (D. Mass., 1994). Much like the New York Court of Appeals recently noted in Penguin Group (USA), Inc. v. American Buddha, 16 N.Y.3d 295, 304-05; 946 N.E.2d 159, 163-64 (N.Y. 2011), the crux of Plaintiff's claim in the instant case is not "merely the unlawful electronic copying or uploading" of copyrighted works, but rather it is the "intended consequence of those activities – the instantaneous availability" of those works to anyone with an Internet connection. Put another way, the location of the infringer in online cases is of little import inasmuch as the primary aim of the infringer, which is to make the copyrighted works available to anyone with access to the

---

[10] While Believe entered into a distribution agreement with SAAR in April 2013, the fact remains that Believe has always had access to the full accounting records of MTunes, the company it acquired and which distributed the recordings for SAAR prior to April 2013. Ms. Hindermeyer's Declaration conveniently makes no mention of this whatsoever.

Internet.  As the *Penguin* Court recognized, in the age of digital distribution, it is "illogical to extend [the concept of equating a plaintiff's injury with the place where its business is lost or threatened] to online copyright infringement cases where the place of uploading is inconsequential and it is difficult, if not impossible, to correlate lost sales to a particular geographic area."  *Id*. at 164.

The *Penguin* Court also recognized a critical factor that is at the heart of the instant case – that the Copyright Act affords owners of copyrighted works <u>exclusive</u> rights, which results in an "overarching right to exclude others from using his property."  *Id*., *citing to* <u>eBay Inc., v. MercExchange, LLC</u>, 547 U.S. 388, 392 (2006).  Here, both Defendants have blatantly infringed upon Plaintiff's "overarching right" to exclude Defendants from exploiting the Catalog, which has resulted in lost profits, lost opportunity, and costs in enforcing its rights against infringers such as Defendants.  For all of the reasons set forth above, Plaintiff submits that the *sine qua non* for *in personam* jurisdiction has been satisfied with respect to both Defendants.

### B. Plaintiff's cause of action arises directly from Defendants' activities in Tennessee.

As in *Mohasco*, this dispute arises by virtue of the Defendants' infringing activities on Plaintiff's exclusive copyrights.  Some of those infringing activities clearly occurred within Tennessee.  The *Mohasco* court noted that the Tennessee legislators have declared that the "State's interest in any cause of action [arises] from ***any*** business transaction in Tennessee." <u>Mohasco</u>, 401 F.2d at 384 (emphasis added); *See also* <u>Lanier v. American Bd. of Endodontics</u>, 843 F.2d 901, 906 (6th Cir. 1988).  To that end, the court noted that "cases of isolated torts by corporate agents in states having no other relevant contact with the defendant corporation seem to have never given the courts any difficulty." *Id*. at 384 n.31.  A state has an interest in providing a remedy once damage has occurred.  *Id*. at 385.  Here, Defendants' infringing

activities began as far back as March 1, 2000. Doc. No. 15, ¶ 6; Doc. No. 22, ¶ 3. Those infringements continued as recent as March 2015 when Plaintiff continued to find Point Classics recordings available for purchase in the United States. *See* OMIP8384-8386. The March 2015 infringements are a continuing tort relating back to the March 2000 license agreement between SAAR and HHO Limited. Furthermore, MTunes began digitally distributing on behalf of SAAR in October 2007. BEL0013-20. One year later, Believe acquired MTunes and continued distributing the recordings on behalf of SAAR. *See* Aymeric Pichevin, *France's Believe Acquires MTunes,* BILLBOARD (October 8, 2008), http://www.billboard.com/biz/articles/news/global/1302849/frances-believe-acquires-mtunes, Exhibit O.

Defendants' exploitation of the Catalog without a valid license, which would have been required in 2000 (or again in 2007 or 2008 when SAAR attempted to sublicense to MTunes and then to Believe) from the LLC, a Tennessee limited liability company, caused the instant cause of action. Defendants' further step of actually placing the product into commerce, which included Tennessee, also gives rise to the cause of action against Defendants. Additionally, it is unknown what other commerce either Defendant has engaged in throughout Tennessee aside from the Catalog, but presumably, both have much more than what is currently reported given Believe's public assertion that it is the "leading fully independent digital distribution and services provider for artists and labels worldwide." *See* Exhibit P, http://www.believedigital.ca/about. Moreover, Believe recently acquired TuneCore, Inc., the "premier digital music distribution company with one of the largest music catalogs in the world." *See* Tim Ingham, *Believe Digital Fully Acquires Rival TuneCore*, MUSIC BUSINESS WORLDWIDE, (April 16, 2015), http://www.musicbusinessworldwide.com/believe-digital-acquires-rival-

tunecore/ (April 21, 2015), Exhibit Q; *See also* Exhibit R, http://www.tunecore.com/index/what_is_tunecore.

Ultimately, Defendants are asking that this Court turn a blind eye to the fact that they injected the copyrighted recordings (in 2000 and continuing via the MTunes 2007 agreement), which were owned by a Tennessee company, into Tennessee commerce, along with each and every other individual state of the United States. Yet despite that, Defendants seek to escape this Court's and presumably every other district court's jurisdiction simply because they claim that neither Defendant has been physically located in the United States. This argument fails under the remotest level of logic and a ruling to that end would have an immense chilling effect on U.S. companies enforcing their rights against foreign copyright infringers who access the U.S. marketplace.

### C. Exercise of jurisdiction over Defendants is reasonable because of the consequences caused by their acts.

Finally, Tennessee has an interest in resolving this dispute just as many other disputes have been resolved involving similar infringements of the same Catalog. *Supra* pg.2 n.2. The infringements began as early as 2000, prior to the 2009 administrative dissolution of the LLC. Beyond the administrative termination, as allowed pursuant to Tenn. Code. Ann. § 48-247-201, the Members of the LLC continued business with the sale, transfer and other disposal of the LLC's assets in the usual and regular course of its business over the next several years until October 2014, at which point, all necessary intellectual property assignments were executed and recorded with the proper authorities (e.g., USPTO and Library of Congress). During the post-administrative termination period, the Members were acting as a general partnership based on general corporate principals. *See* Powers v. Terry, 2001 Tenn. App. LEXIS 872 at *11-12 (Tenn. Ct. App. 2001) (noting that when a corporation is administratively dissolved, the result is

12
Case 3:14-cv-00957   Document 68   Filed 05/13/15   Page 12 of 20 PageID #: 1427

the passing of property to shareholders who then continue as a partnership). The Point Classics General Partnership continued to be the owner of record with the Library of Congress through an effective date of July 1, 2014, in accordance with the Copyright Assignment, which was recorded with the Library of Congress on October 3, 2014. *See* Exhibit G.

As noted above, ***any*** business transaction in Tennessee gives rise to a state interest. Mohasco, 401 F.2d at 384. Limited accounting records produced by Believe[11] revealed the following transactions broken down by zip code presumably for the time period of April 2013 through an unknown date (but presumably through 1Q 2014):

- (i) A total of 849 transactions (either individual song or album) with an identifiable US zip code.
- (ii) Of the 849 transactions, transactions occurred in all 50 states, plus Puerto Rico and a Military Base. Tennessee had the 17th most transactions of the 50 states and tallied about 1.3% or 11 of the transactions. Thirty states had fewer than ten transactions for the limited time period and limited scope of recordings for which accounting records were produced.
- (iii) The top four states for transactions were California (214 or 25%), Texas (79 or 9.3%), New York (58 or 6.8%) and Florida (54 or 6.4%).

It is unknown how many total transactions occurred in Tennessee across all 1,466 recordings (let alone other non-Catalog related commerce) since those accounting documents were not produced by either Defendant. Nonetheless, utilizing the *Mohasco* test, eleven transactions clearly show that commerce occurred in Tennessee, even without including the two transactions linked to Plaintiff's counsel. Those transactions, coupled with the other items noted above in section I.A.,

---

[11] Believe refused to provide full accounting records covering <u>all</u> 1,466 recordings in question and only produced accounting records for the approximate 150 recordings that were taken down by Plaintiff in 2013.

13
Case 3:14-cv-00957  Document 68  Filed 05/13/15  Page 13 of 20 PageID #: 1428

satisfy the *Mohasco* requirements for this Court to exercise personal jurisdiction over both Defendants. While both Defendants attempt to run from the jurisdiction of this Court (and any other U.S. court), they continue to reap the benefits of consumers in Tennessee, each infringement of which relates back to the original infringing activities of March 2000 when the SAAR/HHO Limited license was entered into, along with the 2007 MTunes distribution agreement.

Tennessee also has a further interest in resolving this dispute by virtue of the original Plaintiff's continuing interest in this case. As disclosed during the jurisdictional discovery, Point Classics General Partnership (and the same individuals who were Members of the LLC), remain subject to indemnifying One Media with respect to this litigation. *See* Exhibit F at ¶ 4. Telos Holdings, Inc., Point Classics General Partnership and the LLC (all of which have the same two Members/partners/owners) further remain subject to a holdback fund of One Media IP Limited's purchase price, which is, in part, a direct result of this litigation. *Id*. That the current Plaintiff is a UK entity that inherited the pending litigation against Defendants should have no bearing on whether or not this Court has personal jurisdiction over the Defendants. The fact remains that a Tennessee entity (and in fact, two entities including the general partnership) remain vested in the outcome of this dispute, and as such, Tennessee has a clear interest in resolving the dispute.

## **CONCLUSION**

For the reasons set forth above, including, but not limited to the fact that both Defendants have (i) impeded upon Plaintiff's exclusive copyrights; (ii) entered into a nationwide distribution agreement for the purpose of unlawfully exploiting those copyrights; (iii) injected the recordings into the United States marketplace, including within Tennessee; and (iv) reaped the benefits of unlawful sales of the recordings within Tennessee, and because Tennessee entities remain

financially vested in the outcome of this dispute, which involves infringements going back 15 years, the *Mohasco* elements have been fully satisfied, which gives this Court the ability to exercise personal jurisdiction over both Defendants.

## II. **In the alternative, this Court should Transfer Venue to U.S. District Court, Eastern District of New York.**[12]

Alternatively, ample evidence has been disclosed by Defendants to justify this Court entering an Order transferring this case to the U.S. District Court for the Eastern District of New York in accordance with U.S.C. §1404(a), §1406(a) and/or §1631. The Court may transfer a case in its discretion pursuant to §1404(a) if (1) venue is proper in that court, (2) the action could have originally been brought in that court; and (3) transfer is necessary for the convenience of the parties and witnesses and is in the interest of justice. Mullins v. ADB Logistics, Inc., 2009 U.S. Dist. LEXIS 66423 at *5 (E.D. Tenn., July 31, 2009). Likewise, under §1406(a), "the district court of a district in which [a case is filed] laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." State Indus. v. Beckett Gas, Inc., 200 F.R.D. 392, 398 (M.D. Tenn., April 6, 2001). The Sixth Circuit has followed this even when the court lacks personal jurisdiction over the defendant before the transfer. *Id. citing to* Pittock v. Otis Elevator Co., 8 F.3d 325, 329 (6th Cir. 1993). Because the Defendants have argued extensively that there is tenuous to no connection with Tennessee, Plaintiff files this cross-motion to transfer venue.

### A. **Venue is proper in the Eastern District of New York.**

As a result of the limited jurisdictional discovery that took place over the past ninety days, Plaintiff has discovered further evidence of Defendant Believe's extensive connection to

---

[12] While Plaintiff maintains that there is more than ample evidence to support exercise of personal jurisdiction over both Defendants in Tennessee, Plaintiff files this cross-motion in the interest of preserving its rights and in the interest of justice.

New York, some of which was not previously known to Plaintiff to the full extent that is now known. Following are reasons why a transfer to New York is proper:

- New York is the *situs* of the third highest number of transactions to U.S. consumers via iTunes with respect to the limited number of sound recordings for which Believe produced accounting statements.

- Believe entered into a lease for office space with Green Desk, LLC for a location at 67 West Street, Brooklyn, NY, 11222 on March 15, 2014. The lease was executed by Nicolas Liogler, CFO of Believe SAS in Paris, France. **Green Desk License Agreement**, Exhibit S.

- Believe advertised having at least three **employees** (Shane German, Trevor Jett Wells and Jen Brown) and an intern (Paris Rabone) in New York via its official blog website www.believe.co.uk / www.blogbelieve.com on November 9, 2012. Doc. No. 45-2.

- Believe entered into "contractor" agreements with:
  - Shane German of 81 Russell Street #1R, Brooklyn, NY on April 27, 2013, whose title was Head of US Label Relations. **German Consultant Agreement**, Exhibit T and Doc. No. 45-4.
  - Trevor Jett Wells of 190 Pulaski Street Apt. #1, Brooklyn, NY on December 22, 2014, whose title is Head of US Trade. **Wells Consultant Agreement**, Exhibit U.

- Believe promoted the opening of its US office in Brooklyn on November 20, 2012, via its website www.believe.co.uk / www.blogbelieve.com. Doc. No. 45-3.

- Believe promoted moving offices from Brooklyn to Manhattan via its Believe Digital USA Twitter account on May 21, 2013. Doc. No. 45-5.
- Believe issued a PowerPoint presentation to the public that noted having "three **employees**" in the United States (emphasis added). Doc. No. 61-3.
- Believe acquired TuneCore, Inc., a New York-based music distribution company, on or about April 16, 2015. *See* Exhibit Q.

Defendant Believe has attempted to re-write the past by claiming that Believe has "never had any employees, representatives or offices in the United States." Decl. of Hindermeyer, Doc. No. 38-2 at ¶4. Now that Believe has been caught as a copyright infringer, it would seek to have this Court believe a self-serving declaration over an office lease, two employment contracts, multiple blog postings and multiple advertising/promotional materials that directly contradict Ms. Hindermeyer's declaration. Further, Believe now seeks to characterize Mr. German's relationship as that of a "single independent marketing consultant." *Id.* The fact that the contracts between Believe and Mr. German and Mr. Wells are titled "consultant agreement" does not in and of itself make the individuals consultants. *See* Keller v. Miri Microsystems, LLC, 2015 U.S. App. LEXIS 4887 at *7, (6th Cir. March 26, 2015), *citing to* Rutherford Food Corp. v. McComb, 331 U.S. 722, 729 (1947).[13] It is clear from looking at both individuals' job titles (Head of US Label Relations and Head of US Trade) that these two individuals have been hired to be local salesmen for Believe.

Additionally, Believe has attempted to completely distance itself from its connections to the United States now that it is potentially on the hook for copyright infringement. Specifically, Ms. Hindermeyer claims that "Believe Digital Group" is not a "d/b/a of Believe S.A.S." *Id*. at ¶

---

[13] Plaintiff does not seek to fully brief the legal arguments of whether the individuals are legally employees or independent contractors, but rather merely points out the convenient post-Complaint classification that Believe clings to by no longer standing by the term "employees" that it previously touted to the public.

17

3. She also claims that "Believe US is not associated with Believe S.A.S." *Id.* Believe has also declared that it has "never had an office…in the United States." Believe's Resp. to Pl.'s Interrog. at ¶2. If that were the case, why would Believe S.A.S.'s Chief Financial Officer sign an office lease for space that housed its "consultant" employees in Brooklyn? Moreover, Believe CEO, Denis Ladegaillerie, is the signatory to the "consultant" agreements for the individuals who worked out of the New York office that Ms. Hindermeyer declared "never" existed. Those "consultants" were repeatedly held out to the public as "employees" on Believe's own website, news feed and Twitter (the Twitter account of which was labeled "Believe Digital USA"). For Believe to not be associated with Believe US, the Court would have to completely disregard at least three contracts that were entered into between Believe and US "contractors" and a leasing agency.

It is clear from the documents produced during limited jurisdictional discovery that Believe was intimately involved with the Brooklyn/Manhattan office, which included three employees, as described by Believe prior to the initiation of this litigation. Additionally, Believe has now acquired TuneCore, Inc., a New York-based independent music distribution and services company. *See* Exhibit Q. Believe has done and continues to do extensive business out of New York. For all of these reasons, venue is proper in the Eastern District of New York, which handles cases located in Brooklyn.[14]

### B. The Complaint could have originally been filed in the Eastern District of NY.

Had Plaintiff known all that it knows now following jurisdictional discovery (as noted in Section A above), it would have had more than enough justification for filing the Complaint in

---

[14] Plaintiff maintains that because of Believe's connection to the forum, SAAR remains subject to personal jurisdiction for the same reasons noted above in Plaintiff's supplemental response to Defendants' Motion to Dismiss by virtue of SAAR utilizing Believe for the nationwide distribution. In sum, wherever jurisdiction may be found for Believe, it must be found for SAAR since SAAR's activities are at the root of the infringement claim.

18
Case 3:14-cv-00957 Document 68 Filed 05/13/15 Page 18 of 20 PageID #: 1433

the Eastern District of New York. For the reasons set forth above, the Complaint surely could have been originally filed in the Eastern District of New York.

### C. Transfer is necessary for convenience of the parties and witnesses, and is in the interest of justice for Plaintiff.

As Defendants have noted, Believe is located in Paris, France. SAAR is located in Milan, Italy. The current Plaintiff is located in London, England. The length of a typical flight from any of those locations to New York is shorter than continuing to travel to Nashville (in fact, it is no secret that every one of those locations would likely require a connection through one of New York's major airport hubs). The only witness who would potentially be inconvenienced by the transfer of this case from Nashville to New York is Plaintiff's witness, Jim Long, who resides in Malibu, California and suffers from the serious medical condition of Parkinson's disease.

Additionally, because this Court does not need to have personal jurisdiction over the Defendants before transferring to another district court in accordance with 28 U.S.C. §1406, it is proper to transfer to New York because the case could have originally been brought there. *See* Jackson v. L&F Martin Landscape, 421 Fed. Appx. 482, 483 (6th Cir. 2009), *citing to* Martin v. Stokes, 623 F.2d 469, 471, 474 (6th Cir. 1980). Section 1631 further provides that when the court "finds that there is a want of jurisdiction," it "shall, if it is in the interest of justice, transfer such action…." *Id.* Transferring the case to New York will allow the instant litigation to continue without requiring the parties to start over from square one with service of process, discovery, etc. Transfer will afford all parties the ability to continue with the pending litigation and not lose time or expend unnecessary resources. Plaintiff submits that it because of the jurisdictional discovery findings, it is very much within the interest of justice to transfer the case to New York to allow the parties to proceed on the merits of the case.

19
Case 3:14-cv-00957 Document 68 Filed 05/13/15 Page 19 of 20 PageID #: 1434

## CONCLUSION

For the reasons set forth herein, Plaintiff requests that, in the alternative, the Court grant its cross-notion to transfer venue of the pending case to the Eastern District of New York.

Dated: May 13, 2015					Respectfully submitted,

					**KELLER TURNER RUTH**
					**ANDREWS GHANEM & HELLER, PLLC**

					By:	/s/ Jason L. Turner_____
						Jason L. Turner
						Jennifer S. Ghanem
						700 12th Avenue South, Suite 302
						Nashville, TN 37203
						(615) 244-7600 (phone)
						(855) 344-7600 (fax)
						*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on May 13, 2015, a true and correct copy of the foregoing document has been served upon those parties registered through the Court's ECF system if available, or by placing same in the U.S. Mail, to the following persons or parties:

Samuel D. Lipshie
Patricia Head Moskal
Jeffrey L. Allen
Bradley Arant Boult Cummings, LLP
1600 Division Street, Suite 700
Nashville, TN 37203

Henry Hadaway Organisation, Ltd.
HHO Licensing Limited
Henry Hadaway
Lawrence.abramson@keysontelaw.co.uk

John J. Griffin, Jr.
Michael A. Johnson
Kay Griffin Enkema & Colber, PLLC
222 Second Ave. North, Suite 340M
Nashville, TN 37201

David M. Given
Phillips, Erlewine Given & Carlin, LLP
39 Mesa Street, Suite 201
The Presidio
San Francisco, CA 94129

					 /s/ *Jason L. Turner*_____
					Jason L. Turner