ONE MEDIA IP LIMITED, as )
successor-in-interest to TELOS HOLDINGS, )
INC. d/b/a Point Classics, )
 )
      Plaintiff, )     **Case No. 3:14-cv-0957**
 )     **Judge Aleta A. Trauger**
v. )
 )
S.A.A.R. SrL, BELIEVE SAS d/b/a BELIEVE )
DIGITAL GROUP and BELIEVE US, HENRY )
HADAWAY ORGANISATION, LTD., HHO )
LICENSING LIMITED, HENRY HADAWAY, )
And DOES 1-10, inclusive, )
 )
      Defendants. )

## MEMORANDUM

Pending before the court are motions to dismiss for lack of personal jurisdiction under

Rule 12(b)(2) filed by defendants S.A.A.R., SrL. ("SAAR") (Docket No. 19) and Believe S.A.S.

("Believe") (Docket No. 38), to which the plaintiff filed Responses in opposition (Docket Nos.

22 and 45), each defendant filed a Reply (Docket Nos. 28 (SAAR) and 55 (Believe)), the

plaintiff filed a Supplemental Response relative to Believe (Docket No. 63), and the parties,

following discovery, filed supplemental briefs (Docket Nos. 68 (plaintiff), 69 (Believe), and 70

(SAAR)).  For the reasons stated herein, the motions will be granted.

## BACKGROUND

### I.  Overview

Plaintiff One Media IP Limited, as successor-in-interest to Telos Holdings, Inc. d/b/a

Point Classics ("One Media"), is a corporation organized under the laws of the United Kingdom.

Defendant SAAR is an Italian company, defendant Believe is a French company, defendant

1

Henry Hadaway is a U.K. citizen, and defendants Hadaway Organisation Limited and HHO Licensing Limited (both affiliated with Hadaway himself) (collectively with Hadaway, the "Hadaway Defendants") are U.K. companies. One Media alleges that the defendants infringed its copyright interests in a set of classical music recordings, which the court will refer to as the "Catalog." SAAR and Believe have filed separate motions to dismiss under Rule 12(b)(2), contending that the court lacks personal jurisdiction over them.[1]

After reviewing the parties' briefs, the court permitted the parties to conduct limited jurisdictional discovery. (Docket No. 65.) The parties conducted discovery and have filed additional briefs and evidentiary materials. The court's summary of the facts is drawn from the parties' submissions, including declarations and other evidentiary materials (some authenticated, some not). (*See, e.g.*, Docket Nos. 19, 22, 28, 45, 63, 68, and 69.)[2]

## II. Facts

### A. One Media's Rights to the Catalog

---

[1] Despite receiving service (Docket Nos. 32, 33, and 36), the Hadaway Defendants did not respond to the First Amended Complaint. The plaintiff filed a Motion for Entry of Default (Docket No. 42), in which it quoted counsel for the Hadaway Defendants as having stated "they will not be taking any part in the proceedings nor otherwise submitting to the jurisdiction of the Tennessee court." On October 21, 2014, the Clerk docketed an Entry of Default against the Hadaway Defendants under Rule 55(a). The plaintiff has not moved for a default judgment under Rule 55(b).

[2] Among other materials, SAAR filed the Declaration of Boris Julius Guertler (Docket No. 19, Ex. 1), Believe filed the Declaration of Anne Hindermeyer (Docket No. 38, Ex. A), the Declaration of Kyle P. O'Malley with attached exhibits (Docket No. 69) and the Declaration of Jim Long filed in a previous case (*id.*, Ex. J thereto), and the plaintiff filed the Declaration of Jim Long (Docket No. 22, Ex. C) and the Declaration of Jason Turner (plaintiff's counsel) (*id.*, Ex. D).

2

Through a series of assignments, corporate mergers, and the like, chain of title to One Media's copyright interest in the Catalog traces back to the 1980s.[3]  Although One Media's discovery responses are vague on the subject (O'Malley Decl., Ex. P), it appears that the recordings on the Catalog were originally published in Eastern Europe in the 1980s and that title to them was held (at some early stage) by an entity affiliated with the Hungarian government.  From March 31, 1992 through June 23, 2000, several different European-based companies held title to the Catalog.[4]

In June 2000, title to the Catalog shifted to a series of United States-based companies affiliated with an American individual named Jim Long.  On June 23, 2000, Long's company OneMusic Corporation ("OneMusic"), a Texas corporation for which Long served as CEO, acquired the rights to the Catalog.  On November 1, 2000, OneMusic assigned its interest in the Catalog to Point Classics, LLC (the "LLC"), a Tennessee limited liability company of which Long was a Member.  (*See* Docket No. 68, Exs. A and B (Resp. to Interrogatory No. 14.).)[5]  On the Tennessee Secretary of State website, the LLC is listed as having a "Principal Office" at an address in Malibu, California.[6]  (O'Malley Declaration, Ex. K.)  At any rate, between 2001 and

---

[3] Information concerning the chain of title to these catalogs remains vague.  The court's discussion of the corporate relationships and chain of title is based on the information in the record and is made solely for purposes of resolving the motion.  The court's factual findings should not be taken as preclusive findings of fact for any other purpose.

[4] The Long Affidavit, which attempts to trace the chain of title to the Catalog and the associated licenses, is difficult to follow.  The court has done its best to make sense of its incomplete descriptions of the transactions.

[5] In its Supplemental Brief, One Media represents that Long and his wife became the sole Members of Point Classics LLC "circa 2000 at the time the LLC acquired the Catalog."

[6] In a sworn interrogatory response, One Media represents that the LLC had an office in Nashville from July 2000 "through an unknown date" and that the LLC had two "additional

3

2005, the LLC obtained Certificates of Registration from the United States Copyright Office for the compositions within the Catalog (the "Copyright Registrations"). (Docket No. 68, Ex. C (collectively).)

The Amended Complaint alleges that, on August 18, 2006, the LLC entered into a three-year limited licensing agreement with Henry Hadaway Organisation Limited ("HHO #1") related to the Catalog (the "PC/HHO #1 License"). According to the Amended Complaint, the PC/HHO #1 License expressly forbade HHO #1 from granting sublicenses related to the Catalog.

On December 11, 2007, the LLC filed Articles of Termination (bearing Long's December 8, 2007 signature) with the Tennessee Secretary of State. (*See* O'Malley Decl., Ex. H.) On December 18, 2007, the LLC filed a Notice of Dissolution (bearing the December 1, 2007 signature of Robert Sullivan as "Attorney" for the LLC), which indicated that the LLC's members had approved the company's dissolution. A notice from the Tennessee Secretary of State indicates that the effective date of the dissolution was December 18, 2007. According to One Media, the Tennessee Secretary of State never accepted or recorded the LLC's Articles of Termination.[7]

---

locations" at a P.O. Box and at a specific address in Malibu, California. The court agrees with the defendants that the interrogatory response is evasive and fails to clarify which of these three addresses constituted the LLC's principal place of business at any given point in time. The court explicitly advised the plaintiff to identify these data points with clarity, which the plaintiff failed to do. For purposes of the pending motions, the court will rely on the Tennessee Secretary of State website, which necessarily reflects the LLC's representations to the public about its principal place of business. Indeed, public records indicate that Long has owned the Malibu property at the address identified in the interrogatory response since at least 2000.

[7] One possible explanation is that the LLC filed materials in the wrong order. The LLC filed Articles of Termination on December 11, 2007, one week *before* filing the Notice of Dissolution and 20 days before spinning off its assets. In fact, it appears that the appropriate order would have been to file the Notice of Dissolution first, to spin off the assets second, and to file Articles

4

On December 31, 2007 – during the term of the PC/HHO #1 License – the LLC assigned

its interests in the Catalog to Telos Holdings, Inc. ("Telos"), a Texas corporation owned by the

Longs.  (O'Malley Decl., Ex. L.)  In the agreement, the LLC assigned to Telos "all of the

Assignor's right, title and interest in" the Catalog, "together with all copyrights and all other

rights in and to the Master recordings throughout the world under any law, statute, treaty or

regulation, now or later existing or enacted, for the use of the Master Recordings or infringement

of the copyright in them or any other legal or equitable right to the use and ownership of them in

all fields of use now or later existing throughout the world and otherwise throughout the universe

by means or technology now known or later existing."  Long signed on behalf of each party to

the agreement.  Telos did not record an assignment of copyright with the Library of Congress,

nor did the LLC make any updated filing with the Tennessee Secretary of State.

Although the plaintiff continues to represent that the LLC conducted "winding down

business activities" after 2007, it has not provided evidence of actual business activity after

December 31, 2007.[8]  On July 16, 2009, presumably because the LLC had never made a

_____

of Termination third.  On December 18, 2007 (one week after filing the Articles of Termination)
the LLC filed its Notice of Dissolution.  Upon receiving that notice, the Secretary communicated
to the LLC as follows: "When the limited liability company has distributed all of its assets it
must file articles of termination of limited liability company existence with the secretary of
state."  (O'Malley Decl., Ex. H, Page ID #: 2230.)  As this communication indicates, the
Secretary expected the LLC to file Articles of Termination only *after* it had spun off its assets,
and the communication essentially ignores the LLC's premature December 11, 2007 filing.  As
explained herein, this sequence of transactions may account for two subsequent developments:
(1) the Secretary did not administratively dissolve the LLC until July 2009; and (2) in 2014, the
LLC purported to operate as a continuing general partnership in an effort to ensure that the
LLC's successor-in-interest (Telos) was able to properly transfer assets to the plaintiff (a
transaction detailed herein).

[8] In an interrogatory response, the plaintiff avers that the LLC's "winding down" activities
through July 2014 "included, among other things, continued litigation enforcing its exclusive

supplemental filing or otherwise paid its annual fee, the Tennessee Secretary of State administratively dissolved the LLC. (Pltfs. Supp. Mem., Ex. D.)

On July 17, 2009, Telos informed Hadaway that, effective August 18, 2009 (the last date of the three-year term), the PC/HHO #1 License would be terminated.[9] (O'Malley Decl., Ex. G.) Hadaway confirmed the termination of the agreement in writing. Neither Telos nor its predecessors-in-interest entered into an operative license with Hadaway after the HHO #1/PC License had expired in August 2009.

On July 1, 2014, Telos sold its interests in the Catalog to the plaintiff, One Media, a British company that does not appear to be affiliated with Jim Long. In the agreement, Telos represented that it owned, controlled, and had exclusive rights to the exploitation of the Catalog

---

rights to the Point Classics Catalog, assignment of assets to Telos Holdings, Inc. and Plaintiff [One Media], and recording various documents with the USPTO and Library of Congress." Docket No. 68, Ex. B, Resp. to Interrogatory No. 15.) The record does not bear out this representation. For example, perusing the court docket, there is no indication that the LLC actively litigated a case after December 2007. *See Platinum Entm't v. Point Classics, LLC*, 3:01-cv-1413 (Consent Judgment filed November 18, 2003); *Point Classics, LLC v. MP3.com, et al.*, 3:03-v-1154 (Agreed Order of Dismissal filed October 31, 2005); and *Point Classics, LLC v. Sheridan Sq. Entm't, Inc., et al.*, 3:07-cv-0065 (Agreed Order of Dismissal filed April 3, 2007). In all related cases filed after December 2007, Telos – not the LLC – appeared as the plaintiff-in-interest, including an appearance in one case filed less than one month after the December 2007 asset transfers from the LLC to Telos Holdings. *See Telos Holdings, Inc. d/b/a Point Classics v. X5 Group AB, et al.*, 3:08-cv-0079 (filed January 25, 2008); *Telos Holdings, Inc. v. Cascade, et al.*, 3:09-cv-0380 (filed April 28, 2009).

[9] The Amended Complaint alleges that "[t]he PC/HHO #1 License was terminated by Point Classics via email on July 17, 2009, effective August 18, 2009." Given that the LLC no longer existed by that point and that Telos had acquired the LLC's interest in the Catalog by that date, the reference to "Point Classics" necessarily means that it was *Telos* (doing business as "Point Classics") that terminated the license, not the LLC. This is one of many instances in which the Amended Complaint fudged the distinction between the LLC (a company incorporated in Tennessee) and Telos (a company with no Tennessee connection).

6

and that it agreed to assign to One Media "all of its rights in and to the Catalog[.]" (O'Malley Decl., Ex. F.) The agreement defined the "rights" conveyed as "the exclusive right throughout the world and its solar system to exploit and use the Recordings by all and any means and in all media for the life of copyright of the Recordings . . . ." The agreement also indicated that Telos irrevocably assigned "all and any of Telos's right to receive accountings and payments from Licensees pursuant to the terms of the Licenses," as well as "all and any of Telos's rights in territories outside of the United States of America in and to the words 'Point Classics' and the distinctive hand and baton design . . . ." The agreement also contains a representation by Telos that "*all Rights in and to the Catalogue were assigned by Point Classics to Telos* pursuant to an agreement in writing dated 31st December 2007 since which time Telos's ownership of the Rights and the Catalogue has not been subject to successful challenge." (*Id.* at ¶ 7.9(m) (emphasis added).) On the same date, the LLC, "d/b/a Point Classics and Point Classics general partnership," entered into a separate agreement with One Media, in which it represented that it had "previously assigned its rights of exploitation in and to the Catalogue, but has not effectuated all assignments from PC to Telos[.]" In return for consideration of $1.00, the LLC (or purported general partnership) assigned all of its remaining interests in the Catalog to One Media. Long signed the agreement on behalf of "Point Classics LLC d/b/a Point Classics general partnership."

On October 3, 2014 – several months *after* selling its rights to One Media in July 2014 – Telos recorded with the Library of Congress an assignment of rights from Point Classics LLC. As best the court can discern, the recordation document reflected the December 2007 transfer of interests in the Catalog from the LLC to Telos (as opposed to a contemporaneous transaction between those two entities). On the same date, the LLC and Telos entered into an "Assignment

7

of Copyrights," in which Telos states that it "heretofore acquired all of the assets of Point Classics" in the Catalog and "desires to transfer all such rights" to One Media.

### B. SAAR and Believe's Alleged Infringement of the Catalog

SAAR and Believe have distributed recordings of the Catalog under license agreements that One Media claims were not valid. One Media contends that, from the year 2000 forward, it only licensed the Catalog to a Hadaway entity *once*, specifically for the three-year period from August 2006 to August 2009 (under the PC/HHO #1 License), and that the three-year license prohibited HHO #1 from sublicensing the Catalog. Three sets of licensing transactions involving a Hadaway entity, SAAR, Believe, or a predecessor-in-interest to Believe indicate that licensing activity occurred outside the PC/HHO #1 License.

First, on March 1, 2000 (a few months before Long's company, OneMusic, acquired the Catalog in July 2000), defendant HHO Licensing Limited ("HHO #2") entered into a licensing agreement with SAAR ("SAAR/HHO #2 Agreement"). In the agreement, HHO #2 granted SAAR a non-exclusive right to use the Catalog in Italy, to manufacture, sell, and distribute records of the Catalog in Italy, and to export records of the recordings to other countries within the European Union. The SAAR/HHO #2 Agreement is not in the record, and SAAR has not identified whether this agreement had an intended termination date. According to One Media, HHO #2 had no right to sublicense the Catalog to SAAR at that time. It is not clear from the record whether, after entering into the SAAR/HHO #2 Agreement, SAAR licensed or otherwise profited from exploitation of the Catalog before October 2007.[10]

---

[10] One Media alleges that the Long-affiliated owners of the Catalog (One Music as of June 2000, the LLC as of November 2000, and Telos as of December 2007) were unaware of the SAAR/HHO#2 Agreement until approximately 2013.

8

Second, on October 15, 2007, SAAR and a company called MTunes Digital Distribution GmbH ("MTunes") entered into a "Non Exclusive License Agreement [for] Digital Music Distribution" (the "MTunes/SAAR Agreement"). (Docket No. 68, Ex. H.) In the MTunes/SAAR Agreement, SAAR represented that it "owns or controls" digital distribution rights in an attached list (presumably including the Catalog), while MTunes represented that it owned, operated, and controlled "an infrastructure based on software technology, related databases and file servers for the purpose to make Master Recordings available to consumers for purchase as downloads of digital files [illegible] Partner Websites." As the court understands the agreement, it essentially constituted a sublicense from SAAR to MTunes, which marketed the sublicensed digital music files "worldwide" through third-party websites (with which it had existing contractual relationships) for retail sale to consumers. The agreement was entered into in Hamburg, Germany and stated that it would be governed by German law. In approximately October 2008, Believe acquired MTunes and became its successor-in-interest relative to this agreement. In its initial submissions to the court concerning its Rule 12(b)(2) motion, Believe made no mention of the MTunes/SAAR Agreement.

Third, in April 2013, Believe entered into a distribution agreement with SAAR (the "Believe/SAAR Agreement"), whereby Believe acquired a sublicense from SAAR to distribute SAAR's recordings and music videos through Believe's digital distribution network (again, the third-party websites with which Believe had existing relationships, such as iTunes). (Docket No. 68, Ex. I.) The agreement defined the relevant territory as the "World."[11] One Media contends

---

[11] Curiously, the agreement exempts distribution through YouTube, Spotify, and Google Music. (*See id.*, Appendix B.)

that, if Believe had conducted a copyright search (even a basic search on the Copyright Office's website), it would have determined that the LLC owned copyrights to the works at the time.[12]

In August 2013, Telos allegedly discovered that SAAR was marketing portions of the Catalog on SAAR's website and that recordings that Telos had *not* licensed were presently available for retail sale on third-party websites such as iTunes. On August 27, 2013, Telos sent a letter to SAAR, informing it of the potentially infringing activity and demanding that SAAR provide a copy of the license upon which it was relying for distribution of the Catalog. At some point thereafter, SAAR responded and claimed authority to exploit the works under the March 2000 SAAR/HHO #2 Agreement. As the court understands it, One Media contends that SAAR's position was (and remains) without merit because (1) HHO #2 had no right to grant the license, (2) even if the SAAR/HHO # 2 was valid at the time it was made, it had expired, or (3) even if the license from HHO #2 were valid and had not expired, SAAR's *worldwide* distribution of the Catalog violated the geographic limitations set forth in the SAAR/HHO #2 Agreement[13].

At some point, Telos also discovered Believe involvement in the potentially infringing activity, pursuant to its sublicense from SAAR and its agreements with online retail music websites. The plaintiff asserts that Telos sent one or more cease and desist letters to Believe as well. One Media contends that, for at least some period of time after being notified of the

---

[12] Again, it does not appear that "Point Classics LLC" in fact owned the copyright after December 2007, when the LLC transferred all of its assets to Telos and filed Articles of Termination and a Notice of Dissolution. It appears that the LLC and Telos simply failed to notify the Library of Congress of the assignment. Thus, even if it is true that a post-December 2007 search of the Library of Congress website would have identified the LLC as the owner of the copyright, in actuality Telos held all interests in the copyrights.

[13] The plaintiff alleges that, by this point, the PC/HHO #1 License had expired (as of August 2009) and that no Hadaway entity had a valid license to the Catalog after the expiration of that license.

potential infringement, both SAAR and Believe continued to permit the online sale of the Catalog in the United States and United Kingdom iTunes stores.

### C. Believe and SAAR's Purported Connections to Tennessee

1. <u>Believe</u>

Believe is a "digital music aggregator" that obtains licenses from music rights holders and, in turn, sub-licenses those rights to digital music distributors such as Amazon.com and iTunes, which sell music files to consumers at the retail level.

For example, effective November 5, 2006, Believe entered into an agreement with Amazon Digital Services, Inc. ("Amazon") (a Washington state company), whereby Believe sublicensed its interests in certain digital music files in the Catalog to Amazon for retail sale within "[t]he United States of America, its territories and possessions." (O'Malley Decl., Ex. C (at Page ID # 2194-2197).) The agreement states that it is governed by Washington law and contains a forum selection clause requiring any disputes to be litigated in King County, Washington. (*Id.*) Similarly, effective August 16, 2011, Believe entered into a Content License Agreement with Google, Inc. (a Delaware corporation with offices in California), whereby Believe granted to Google digital files for sale in the "Google Music Store." (O'Malley Decl. Ex. C. (at Page ID # 2198-2209).) The "territory" covered by the agreement is defined as "the world[.]" The agreement states that it is governed by California law and that all disputes must be litigated in Santa Clara, California. (*Id.*) Believe entered into similar agreements with other retail distributors having no relationship to Tennessee, such as Google/YouTube ("world" territory, governed by English law, venued in English courts), Spotify (a Swedish corporation, "world" territory, governed by English and Welsh law, venued in English courts), and iTunes (a California company, "territory" defined as the U.S. and numerous other Central and South

11

American countries, governed by California law, venued in the Northern District of California), among others.  (*Id.* at Page ID # 2202-2218.)  In each of these agreements, Believe agreed to deliver digital files to the distributors, who controlled the music on their own servers from that point forward.  The record contains no indication that any of the servers were maintained in Tennessee.  None of the contracts refer to Tennessee, although Tennessee is a constituent element of the territory covered by each agreement – either as a geographic entity within the "world" or as a State within the "United States."

Excluding two purchases by plaintiff's counsel, Believe's records reflect only nine downloads (eight single tracks and one album) by Tennessee consumers over a six-year period.  (O'Malley Decl., Ex. D.)[14]  In a summary of data produced by Believe and SAAR, Believe estimates that global commerce in the works totaled approximately 53,000 Euro for the 2010-2015 time frame and that Believe engaged in approximately 3,400 Euro of commerce (excluding Believe's retained percentage) in the United States for the 2008-2014 time frame, including just 11 downloads by Tennessee consumers (nine by non-counsel) through third-party websites.[15]

Believe is not licensed or qualified to do business in Tennessee, it has not appointed an agent for service of process in Tennessee, it has no employees in Tennessee, it does not own or lease real or personal property in Tennessee, it is does not maintain bank accounts in Tennessee,

---

[14] The itemized list of downloads does not include a specific date for each download.  There are a total of eleven downloads, two of which were likely made by plaintiff's counsel.  (*See* Docket No. 22, Ex. D., Turner Declaration.)  Downloads by counsel do not provide a factual predicate for personal jurisdiction.  *Reynolds Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1119 (6th Cir. 1994).

[15] Although the plaintiffs complain about the sufficiency of Believe's production of records, the court previously granted the plaintiff leave to file a Motion to Compel.  (Docket No. 67.)  The plaintiff did not take advantage of that opportunity.  It also does not appear that the plaintiff conducted any depositions.

12

it has not negotiated or entered into any contracts, license agreements, or distribution agreements in Tennessee, it does not do business in Tennessee, and it has not conducted any business in Tennessee or collected license fees in Tennessee.

    2. <u>SAAR</u>

SAAR is a digital music aggregator that obtains licenses to digital music recordings and sublicenses them to other music aggregators (such as Believe), which in turn sublicense the recordings to retail music websites such as iTunes.

As explained in a previous section, SAAR entered into (1) the March 2000 SAAR/HHO #2 Agreement that (purportedly) gave it a limited right to market the Catalog, (2) the October 2007 SAAR/MTunes Agreement that granted MTunes worldwide distribution rights, and (3) the October 2013 SAAR/Believe Agreement that granted Believe worldwide distribution rights.[16] All of these agreements were formed abroad, the MTunes and Believe agreements provided for "world" or "worldwide" distribution, and none of the agreements referenced Tennessee in any fashion. However, as the court has stated relative to Believe, Tennessee is a constituent geographic element of the market covered by each of these agreements.

SAAR operates an Italian-language website (www.saarrecords.it or www.saarrecords.com/ita). Certain links on the website allow users to access videos and music recordings, but none of the recordings are available for direct sale from SAAR. Users can search SAAR's catalog of music and can click on links that redirect them to iTunes to purchase the music. Users may also search SAAR's catalog and request licenses from it. The plaintiff has produced unauthenticated, undated screenshots showing that, at an unspecified time, at least

---

[16] Although it is not clear from the record, the court will assume that these agreements each related to the Catalog.

some of the recordings at issue appeared on the SAAR licensing portal. Users can access that portal by clicking on a "licensing" link, at which point the user can enter information to search SAAR's catalog of music and make a request to SAAR to license particular recordings. The form does not include any location information. Sending the form results in a request to SAAR for a license, but it does not guarantee that SAAR will grant the request or that SAAR will even respond. Anyone can fill out the request form, regardless of their location.

SAAR is not licensed to do business in Tennessee, it has not appointed an agent for service of process in Tennessee, it has no offices or facilities in Tennessee, it does not own or lease any property in Tennessee, it has not negotiated any contracts or entered into any contracts in Tennessee, it conducts no business in Tennessee, and it has not paid or collected any licensing fees in Tennessee.

### D. Procedural History

On April 8, 2014, Telos filed a Complaint against SAAR and "Believe Digital," alleging federal copyright infringement claims, with respect to which it requested declaratory and injunctive relief. (Docket No. 1.)

As discussed above, on July 1, 2014, Telos transferred its interests in the Catalog to One Media. Accordingly, on July 30, 2014, One Media filed a First Amended Complaint ("FAC") that (1) substituted "One Media IP Limited as successor-in-interest to Telos Holdings, Inc." as the plaintiff; (2) restyled the "Believe" defendant as "Believe SAS d/b/a Believe Digital Group and Believe US"; and (3) added the Hadaway Defendants and several unnamed "John Doe" entities as defendants.[17]

---

[17] The FAC also added a claim for unfair competition and includes a request for an accounting.

In contrast to SAAR and Believe, the Hadaway Defendants failed to respond to the FAC. On October 21, 2014, upon motion, the Clerk entered a Notice of Default against the Hadaway Entities. (Docket No. 56.) The plaintiff has not moved for a default judgment.

On August 14, 2014, SAAR filed a Motion to Dismiss under Fed. R. Civ. P. 12(b)(2). (Docket No. 19.) On September 24, 2014, Believe filed a Motion to Dismiss under Fed. R. Civ. P. 12(b)(2). (Docket No. 38.)

## RULE 12(B)(2) STANDARD

To survive a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), a plaintiff must prove that jurisdiction is proper over each defendant individually. *SFS Check, LLC v. First Bank of Del.*, 774 F.3d 351, 355-56 (6th Cir. 2014). Thus, One Media, as the party seeking assertion of personal jurisdiction, bears the burden of showing that personal jurisdiction exists. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991); *see also CompuServe, Inc.*, *v. Patterson*, 89 F.3d 1257, 1261-62 (6th Cir. 1996). When, as here, the district court allows discovery on the motion, the court should consider the facts offered by both parties and rule according to the preponderance of the evidence. *SFS Check*, 774 F.3d at 356. Because the court finds no "real dispute" concerning the facts or the extent of discovery, there is no need for an evidentiary hearing, and the burden is on One Media to show that jurisdiction exists over each defendant by a preponderance of the evidence. *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998).[18]

---

[18] In their supplemental briefing, Believe and SAAR argue that the preponderance of the evidence standard applies (as opposed to the lesser *prima facie* burden), whereas the plaintiff is silent on the appropriate standard. The plaintiff has not sought leave to respond to the defendant's articulation of the evidentiary standard, which the court construes as a tacit admission that, as the court has concluded, the preponderance of the evidence standard applies here. The court granted the parties the opportunity to conduct unfettered jurisdictional

<u>ANALYSIS</u>

I. <u>Legal Standard for Specific Personal Jurisdiction</u>

The plaintiff concedes that the court lacks general personal jurisdiction over SAAR and Believe.   The parties agree that the motion turns on whether the court has specific personal jurisdiction over those defendants, that the federal and Tennessee minimum contacts analysis merge into a federal due process analysis because Tennessee's Long-Arm Statute reaches to federal constitutional limits, and that the court must therefore apply the three-part *Mohasco* test set forth by the Sixth Circuit.  *See S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968).  The *Mohasco* test has three elements, all of which must be met for personal jurisdiction to be found:

> (1) "[T]he defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state."
>
> (2) "[T]he cause of action must arise from the defendant's activities" in the forum state.
>
> (3)  "[T]he acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of personal jurisdiction reasonable."

*Id.*  Although all three elements must be satisfied, it is the "purposeful availment" element of the test that is the *sine qua non* of specific personal jurisdiction.  *Id.* at 381-82.

With respect to purposeful availment, the Sixth Circuit has adopted the "stream of commerce 'plus' approach," under which "[t]he placement of a product into the stream of

---

discovery.  The court also specifically granted the plaintiff leave to file a motion compel concerning the only discovery dispute that it raised during jurisdictional discovery, but the plaintiff did not file a motion.  At any rate, even if the court were to apply the lesser *prima facie* burden and to construe all facts in the light most favorable to the plaintiff, it would still conclude that the plaintiff has not made out a *prima facie* case of personal jurisdiction over Believe or SAAR for essentially the same reasons expressed herein.

16

commerce, without more, is not an act of the defendant purposely directed toward the forum State." *Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472, 479-80 (quoting *Asahi Metal Indus. Co., Ltd.*, *v. Superior Court*, 480 U.S. 102 (1987) (O'Connor, J.) (plurality op.)).

As described in *Bridgeport*:

> Purposeful availment is something akin to a deliberate undertaking to do or cause an act or thing to be done in the forum state or conduct which can be properly regarded as a prime generating cause of the effects resulting in the forum state, something more than a passive availment of the forum state's opportunities. The purposeful availment requirement is satisfied when the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there. The purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitious, or attenuated contacts, or of the unilateral activity of another party or a third person. The emphasis in the purposeful availment inquiry is whether the defendant has engaged in some overt actions connecting the defendant with the forum state. If a plaintiff can demonstrate purposeful availment, the absence of physical contacts with the forum state will not defeat personal jurisdiction over a non-resident defendant.

327 F.3d at 478-79 (internal citations, quotations, and brackets omitted).[19]

Personal jurisdiction requires a forum-by-forum analysis. *J. McIntyre Mach. v. Nicastro*, 131 S. Ct. 2780, 2789 (2011). "The question is whether a defendant has followed a course of conduct directed at the society or economy within the jurisdiction of a given sovereign." *Id.*

---

[19] In *Asahi*, Justice O'Connor and three other justices endorsed the "stream of commerce plus" approach. By contrast, Justice Brennan and three other justices endorsed the "stream of commerce" approach, under which "jurisdiction premised on the placement of product into the stream of commerce is consistent with the Due Process Clause." 480 U.S. at 117. Subsequent to *Asahi*, some circuits adopted Justice O'Connor's more stringent approach, while others adopted Justice Brennan's more lenient approach. *See, e.g.*, *Dehmlow v. Austin Fireworks*, 963 F.2d 941, 947 (7th Cir. 1992) (adopting "stream of commerce" test); *Bridgeport*, 327 F.3d at 479-80 (adopting "stream of commerce plus" test). In *J. McIntyre Mach. v. Nicastro*, 131 S. Ct. 2780, 2789 (2011), the Supreme Court again did not resolve this split, and the competing opinions in that case demonstrated a continuing schism within the Court on this issue. *See AFTG-TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1362-63 (Fed. Cir. 2012) (discussing *Asahi* and *Nicastro*).

Courts within this circuit agree that, because the Supreme Court in *Nicastro* did not resolve the circuit split concerning the "stream of commerce" approach and the "stream of commerce plus" approach, the Sixth Circuit's "stream of commerce plus" approach continues to control. *See, e.g.*, *Lindsey v. Cargotec USA, Inc.*, 2011 WL 4587583, at *7 (W.D. Ky. Sept. 30, 2011) (discussing continuing validity of *Bridgeport* standard post-*Nicastro*).

In *Eaves v. Pirelli Tire*, 2014 WL 1883791 (D. Kan. May 12, 2014) – a case relied upon by Believe – a federal district court examined the post-*Nicastro* landscape in detail and identified the following factors that federal courts had found to be relevant to the purposeful availment analysis in the stream of commerce plus context: (1) the defendant's direction or control over the flow of the product into the forum; (2) the quantity of the defendant's particular product regularly flowing into the forum; and (3) the distinctive features of the forum that connect it with the product in question. *Id.* at *14. Here, the court finds these factors to be relevant considerations in the purposeful availment analysis.[20]

As to websites, a defendant purposely avails itself of the privilege of acting in a state through its website if the website is interactive to a degree that reveals specifically intended interaction with residents of the state. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883 (6th Cir. 2002) (citing *Zippo Mfg. Co. v. Zippo Do Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)). "The level of contact with a state that occurs simply from the fact of a website's availability on the Internet is therefore an 'attenuated' contact that falls short of purposeful availment." *Neogen*, 282 F.3d at 890. Under the *Zippo* "sliding-scale" test, which the Sixth Circuit endorsed in *Neogen*, the sliding scale ranges from "one end of the spectrum . . . where a

---

[20] The parties have not cited any analogous post-*Nicastro* authority within the Sixth Circuit concerning the purposeful availment element.

18

defendant clearly does business over the internet," in which case jurisdiction is proper, to the "opposite end . . . where a defendant has simply posted information on an Internet [website] which is accessible to users in foreign jurisdictions[,]" in which case jurisdiction is not proper. *Zippo*, 952 F. Supp. at 1124. In the middle of these extremes lie "interactive [websites] where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the [website]." *Id.*

## II. <u>Application</u>

### A. Believe

#### 1. <u>Purposeful Availment</u>

One Media has not met its burden to show that Believe purposely availed itself of the privilege of transacting business in Tennessee.

First, Believe did not control the flow of product into Tennessee specifically. Believe contracted with retail distribution websites located outside of Tennessee, those distributors controlled the digital files outside of Tennessee after delivery from Believe, and users contracted with *those entities* (not Believe) to purchase the digital files. Thus, Believe did not directly contract with end consumers in Tennessee. Furthermore, none of the contracts with retail websites is specific to Tennessee (as opposed to the United States as a whole or the entire world), none of the contracting parties were Tennessee entities, and none of the contracts were formed in Tennessee or invoked Tennessee law. The plaintiffs have not shown that Believe specifically marketed its product to Tennesseans directly or indirectly or that Believe otherwise specifically directed any sales to occur in Tennessee. Believe's broad intention to target the United States through a third party is not sufficient to establish purposeful availment. *See, e.g.*, *Williams v.*

19

*Romarm*, 756 F. Supp. 777, 785 (D.C. Cir. 2014); *AESP v. Signamax*, 29 F. Supp. 3d 683, 690-91 (E.D. Va. 2014) (no specific personal jurisdiction when "record reflects no more than that defendant might expect that the products would eventually be sold somewhere in the United States, including [the forum state]"). As explained in *Bridgeport*, knowledge that a licensee was likely to distribute compositions nationally, coupled with its lack of objection to Tennessee sales, if such sales were ever to occur, is insufficient conduct upon which to predicate purposeful availment. 327 F.3d at 480.

Second, the quantity of recordings that end users ultimately purchased from third parties with whom Believe contracted is negligible – just nine relevant downloads over a six-year period. In opposition to Believe's argument on this point, the plaintiff references several out-of-circuit cases concerning whether the plaintiffs sufficiently pleaded or proved claims for vicarious copyright infringement under the Rule 12(b)(6) or Rule 56 standard, a legally (and procedurally) distinct issue that sheds no light on the personal jurisdiction minimum contacts analysis here. *See Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) (determining that plaintiff sufficiently alleged a vicarious contributory copyright infringement claim against a flea market operator); *Polygram Int'l Publ'g, Inc. v. Nevada/TIG, Inc.*, 855 F. Supp. 1314 (1994) (granting summary judgment to operators of awards ceremony, where plaintiffs failed to prove requisite elements of vicarious copyright liability claim); *Gershwin Publ'g Corp. v. Columbia Artists Mgmt.*, 443 F.2d 1159 (2d Cir. 1971) (holding that concert promoter could be held vicariously liable for infringement by performing artists in concerts that it organized and promoted). This factor weighs strongly against a finding of purposeful availment.

Third, there are no distinctive features of Tennessee that connect it with the recordings in the Catalog. The recordings appear to have been made in Eastern Europe in the 1980's and to

have been owned by European companies through the year 2000. The plaintiff has not identified

anything special about Tennessee – relative to other states – with respect to commerce in

classical music creation or recording. Indeed, there is nothing in the record indicating that

Believe had any specific intention to target Tennessee, and the minimal sales figures bear that

out.

Finally, Believe operates a non-interactive website that is accessible throughout the

world. It offers nothing for sale on the website. The website evinces no interactivity directed at

Tennessee and provides no support for exercising personal jurisdiction over Believe.

Given that all relevant factors weigh against a finding of purposeful availment, the court

finds that the plaintiff has not demonstrated that Believe purposely availed itself of the privilege

of transacting business in Tennessee.[21]

## 2. Whether the Cause of Action Arises from Tennessee Contacts

This element presents a more nuanced question than the defendants acknowledge. One

Media alleges that SAAR and Believe marketed the Catalog worldwide without a valid license.

Does that broad infringement claim "arise from" the handful of consumer downloads from third-

party websites that took place in Tennessee? As explained in the previous section, the court has

found that the downloads – even if the product of infringement – did not amount to purposeful

availment in Tennessee relative to Believe under the stream of commerce plus approach. Having

reached that conclusion, the court is constrained to find that One Media's claims do not "arise

from" contacts that are insufficient to establish purposeful availment in the first place.

---

[21] Without purposeful availment, the plaintiff cannot satisfy the *Mohasco* test. For that reason, the plaintiff has not met its burden to show that personal jurisdiction exists over Believe. In the interest of completeness, the court will also address the other two *Mohasco* elements.

### 3.  Whether Tennessee Has an Interest in Resolving This Conflict

The final element of the *Mohasco* test is whether the acts of the defendant or consequences caused by the defendant have a sufficient connection with the forum state to make the exercise of personal jurisdiction reasonable.  This element turns on whether Tennessee has an interest in resolving the conflict.  *Mohasco*, 401 F.2d at 384.

Particularly in its pre-discovery submissions to the court, the plaintiff has devoted much of its attention to establishing this element of the *Mohasco* test.  In an effort to do so, it has maintained that the LLC's relationship to this lawsuit implicates a strong Tennessee connection because the LLC has a present financial interest in the lawsuit and because it continues to be injured by the defendants' infringing activity.

The plaintiff's representations concerning the LLC are misleading.  The LLC sold its assets to Telos in December 2007 and should have dissolved immediately thereafter.  However, it appears that the LLC simply erred in completing some of the necessary paperwork, such as (1) filing Articles of Termination *after* spinning off its assets and notifying the Tennessee Secretary of State of its intention to dissolve, and (2) informing the Library of Congress of the assignment from the LLC to Telos.  This apparent lack of diligence required some "housecleaning" efforts when Telos sold its interests in the Catalog to One Media in July 2014.  After the asset transfer, in December 2007, Telos also appeared in this court multiple times to protect its interests in the Catalog, including at least one sworn representation to the court that it owned the copyright interests at stake.  Moreover, aside from the fact that it was incorporated in Tennessee and apparently utilizes Tennessee lawyers, the plaintiff has failed to substantiate whether and when the LLC actually operated in Tennessee, as opposed to Malibu, California, where Long appears to have resided for the past 15 years and where the LLC at some point maintained an office.  The

22

court is left with the firm conclusion that, in an effort to create the impression that the lawsuit belongs in Tennessee, the plaintiff has attempted to exaggerate the historical and (at best) negligible connections between the LLC and Tennessee and to manufacture an illusory present financial interest in this lawsuit by that long-defunct entity. Under the circumstances, it is disingenuous for the LLC to claim a true financial stake in this lawsuit through 2014.

Even if it were the case that infringing activity before December 2007 were relevant to the minimum contacts analysis, the plaintiff has not adduced evidence showing that any Tennessee customers actually downloaded Catalog recordings before December 2007. Absent any infringing activity relative to Tennessee consumers before December 2007, the loose affiliation between the LLC and Tennessee is essentially irrelevant. In light of these conclusions, the court finds that the plaintiff has not shown that it would be reasonable for the court to exercise personal jurisdiction over Believe.

In sum, the plaintiff has not satisfied any of the *Mohasco* factors relative to Believe. The court will therefore dismiss all claims against Believe for lack of personal jurisdiction.

### B. SAAR

As an initial matter, for essentially the same reasons as Believe, the plaintiff has not shown that SAAR has sufficient minimum contacts with Tennessee. Moreover, the evidence relative to SAAR is even weaker than the evidence relative to Believe.

The plaintiff has not shown purposeful availment by SAAR relative to Tennessee. SAAR sublicensed the recordings for "worldwide" distribution, evincing no intent to market the product in Tennessee specifically. SAAR's agreements were entered into in Europe and bore no relationship to Tennessee. The plaintiff has not shown that SAAR controlled the flow of downloads into the United States or Tennessee specifically (through third parties or otherwise).

23

The handful of downloads at issue (nine, according to Believe's records) have not been traced to SAAR's website and, even if the downloads were traceable to SAAR's licensing agreement with Believe, the number of downloads is commercially insignificant. Also, the plaintiff has not shown that SAAR made purchases of the recordings available on its website or that any Tennessee consumers actually utilized SAAR's website to do so.

Because SAAR has no contacts with Tennessee other than directing that another distribute to market the recordings throughout the world, there is no basis to conclude that the plaintiff's claims "arise from" SAAR's contacts with this forum.

It would not be reasonable to exercise jurisdiction over SAAR here. It is an Italian company with a principal place of business in Italy, it operates a universally accessible Italian language website that does not target Tennessee, and it does not make purchases available for sale on its website. The plaintiff has not shown that SAAR caused, or that it intended to cause, consequences in Tennessee (namely, the purchase of the recordings at issue by Tennessee consumers) that would make it reasonable for this court to exercise jurisdiction over SAAR.

In sum, the court finds that the plaintiff has not established any element of the *Mohasco* test relative to SAAR. The court will therefore dismiss all claims against SAAR for lack of personal jurisdiction.

### C. Policy Issue

The plaintiff argues that it is unfair to allow foreign music distributors to insulate themselves from liability for wrongdoing simply by using a national or worldwide online retail distributor (such as iTunes) to avoid the "minimum contacts" necessary to support personal jurisdiction in any particular State.

24

This is a legitimate policy argument, particularly in instances where, as here, the infringing online sales are relatively diffuse across states and, in absolute terms, relatively minimal in any particular state. In some sense, under current legal doctrines, an online music distributor can allow for purchases by Americans without actually creating sufficient contacts in any particular state to satisfy the *Mohasco* test. This could force domestic music rights holders to litigate against foreign music distributors on their home turf (in France, the UK, or Italy, for example), which could become prohibitively expensive and less predictable for plaintiffs than litigating in American courts accustomed to adjudicating infringement claims under the Copyright Act. Viewed through this lens, the plaintiff's attempt to litigate against distributors such as Believe and SAAR in Tennessee (or in any other state in which an infringing download is made) may be more legitimate than Believe and SAAR acknowledge.[22]

Here, the court's concern is alleviated by the facts that (1) Tennessee has no meaningful connection to the claims, and (2) the plaintiff is (at least now) a British entity that can obtain recourse through European courts, with which it may be more familiar than Telos. Be that as it may, if there is a fundamental problem with the Sixth Circuit *Mohasco* standard as it applies to worldwide or nationwide distribution agreements entered into by foreign online music distributors, it will be for the Sixth Circuit (not the district court) to redefine the legal standard to address that specific context – assuming that it can be done within Constitutional due process limits.

---

[22] The court expresses no opinion as to whether personal jurisdiction could be exercised over Believe or SAAR in another state, where the quantum of contacts may be different and the state may have a legitimate interest in resolving the claims. Furthermore, the court expresses no opinion as to whether the "stream of commerce" approach (as opposed to the "stream of commerce plus" approach) would have merited a different result here.

25

### III. __Belated Request to Transfer__

In its post-discovery supplemental brief, the plaintiff purports to move the court to transfer the case to the Eastern District of New York under 28 U.S.C. §§ 1404 or 1406. As Believe points out, the request is procedurally improper under M.D. Tenn. Civ. L.R. 7.01(a). The court will deny this request on procedural grounds, without expressing any opinion concerning the propriety of jurisdiction in New York.

### IV. __The Hadaway Defendants__

The Clerk previously entered a default judgment against the Hadaway Defendants. The court's disposition of the motions will result in the dismissal of Believe and SAAR on jurisdictional grounds, but it will not resolve the pending claims against the Hadaway Defendants. The court therefore will set a deadline for the plaintiff to notify the court as to how it will proceed against the Hadaway Defendants.

### __CONCLUSION__

For the reasons stated herein, the Rule 12(b)(2) motions filed by Believe and SAAR will be granted, claims against Believe and SAAR will be dismissed, and the court will order further proceedings relative to the Hadaway Defendants.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

26